May it please the court and the learning council. I would like to reserve four minutes. My name is Robert Huntley, representing the court security officers, former court security officers. I'd like to reserve four minutes for rebuttal. With me at council table is the lead plaintiff, Ron Strolberg. I will address the court only for about one minute. And what I have to say is this, that I believe that the highest calling of courts at any level, and particularly this level, are affording to our citizens, and particularly our public employees, due process of law. I've practiced in this area at the city level, the county level, the state level, the federal level, and I have to say that virtually in every scheme that has been put together relative to the rights of employees, they either get a hearing before they're terminated at the administrative level, they either get a hearing after they've been terminated at the administrative level, or they get a de novo hearing before a court system. This scheme put together by the Marshal Service deprives these court security officers of all three of those levels. But Mr. Huntley, this is based upon a collective bargaining agreement, isn't it? In part, yes, but also... The language that's before us is a provision of the collective bargaining agreement. So you had, I'm sure, able counsel for the union, able counsel for the government, you reached an agreement. After 9-11, there was a concern that some of the court security officers were not able to adequately defend the members of the judiciary. There was new standards imposed. This is what was agreed upon. There was a framework for taking care of this. And one of the conditions that permitted, if you will, a summary dismissal was if someone's medical certification was removed. That's what happened in this case, if by the record is clear. Do you agree with that? I agree that's what happened, but they didn't follow their own rules. Okay, and I know it's your position that, for example, that the Idaho, I guess, case law requiring the implied covenant of good faith and fair dealing applies. In what way does that apply here wherein you're simply following the express language of the contract? Well, that is a very minor part of this issue, and I don't rely on that heavily other than to just show that there should be some fairness in the due process. Fairness is, sadly, almost everyone that comes before us feels they have been unfairly dealt with. Somebody always feels that way. And the reality is, this is a collective bargaining agreement. The contract says what the contract says. Your party's had an opportunity to provide new evidence, which they did in some instances. Some instances they did not. But you're talking about constitutional deprivation of a right. And to be honest with you, I don't see that. Tell me where I'm missing something here. Well, I think the thing that's missing right there is the Ninth Circuit Court case of Thornton v. St. Helens provides that when they set up procedures, that means that they have some property right. The Marshal Service recognized that they couldn't just fire these people without some process. Now, what is due process? Due process is not defined in the constitutions. It's not defined in statute. It's judge-made law, and it's judges looking to see, did these folks get what you would think would be due process? Now, whether or not the contract was followed or not, there are factual questions involved in that. And it's not applicable. But the contract did provide one thing relative to Hawkins. And the court below and in some of the briefing of the government kind of mixes up a couple of things here. Forgive me, I know you want to make a point here, but I'm hoping you can help answer questions. The District Court analogized this situation to cases involving security clearances and specifically cited the Department of Navy v. Egan. Why is the District Court wrong in that analogy? He was very wrong. There was a reason for a lessened level of hearings and due process in security clearances. Why is it different here, unless you value the lives of the federal judiciary less than you do in other areas? Well, I expect the judiciary to value the due process rights of the people who serve it. And if they aren't qualified physically to serve, they should not serve. And we're not asking you to decide whether they could or not, or whether they were able to serve or not. But the Marshalls contract provided that when the final decision came from the U.S. Marshals Service, that triggered a date when they could send materials up. Now, in Hawkins case, the number two plaintiff here, the Marshals decision came into ACAL. ACAL had 15 days to get these folks to get their papers back, and the papers were never read before the final determination. And where it gets mixed... Excuse me. There was an initial paper that was sent in, wasn't there? Yeah, and that's where the confusion is here. These doctors in Atlanta, Georgia, do not make the termination decision. They make a recommendation. And on that one of May 30th, which is in the record here, it said, send more medicals. ACAL, at that time, at that point, the Marshalls Service had not terminated this officer. Then along comes the submittals go from ACAL up back to Washington, D.C., then down to Atlanta, and the Marshalls Service did not get those to the doctor before any final decision was made by the Marshalls Service. Now, the record is very confusing here. People take that paper signed by a doctor as being the termination triggering the 15 days under the ACAL contract. You're focusing on the Hawkins matter. You're aware, of course, that the Third Circuit found this scheme to be constitutionally adequate as far as due process is concerned. Do you feel that the reasoning of the Third Circuit was flawed? Yes, I do. And why is that? Because any process which unnecessarily doesn't give anybody a hearing, we had... They got a hearing. Negative. I'm sorry. You're talking about a face-to-face hearing. That's correct. That's what you want. That's right. And all we want... Let me ask you this. How many CSOs were disqualified in this process? In the Western... In the ACAL series, about 25. 25 nationwide? No, no. About over 250 nationwide. And some of them deserve to be disqualified. How many? Well, we haven't had a hearing on them, so how do we know? Oh, we're having one right now. Well, if you want to decide the facts, and that's what Judge Carter did, frankly, is decide facts on summary judgment. And we're here discussing the facts today. And that's not what summary judgment is for. Are there other lawsuits involving other CSOs who were disqualified? Yes, there are. And a number of them, frankly, have gone the opposite way. But I put in this record the OFCCP findings and the EEOC findings where they discredited those lawsuits. Now, what this boils down to is what two of the three of you decide is a fair process here. And on your question of the difference with security clearance, I've had top security clearance with the United States Navy, and I know you can't bring witnesses in and compromise the system. And that's the reason for the diminished level of due process. We don't have that situation here. There's no reason why a judge can't, or a hearing officer, administrative hearing officer, can't hear this evidence without compromising national security. And we shouldn't be putting, just saying because we're protecting judges, that we throw these people out like this. This is a travesty. We should be ashamed of it. And I'm ashamed of it. And I've used up my rebuttal time, and I've been too loud. You've done well. But I will just close with this. All we're asking is that this thing be referred back to the court, and have him either give us a hearing before an administrative law judge or the equivalent, or that he... What does the contract call for? The contract is silent on this type of thing. In fact, they say, after these terminations, the USMS came out with a letter saying that the contract provisions under Section 3H don't apply to this situation. The plain wording of it is before they amend it with the letter, it didn't say that at all. They just amended it with a letter. And one thing I would like to leave you with, you will not find these regulations or this process in the Code of Federal Regulations. You won't find them under any Administrative Procedure Act. It was just something cobbled together by the Marshals Service, with a little bit of help from middle-level people in the Justice Department, and it's... And lawyers from the union. No, well... Who helped draft the collective bargaining agreement, right? No, the process was developed after the program... Well, let me ask you this. Was the collective bargaining agreement duly and properly entered into, so far as you know? Well, as far as I know, but it was entered into before these regulations came out. I understand that, but the reality is that if the parties had wanted to provide for a hearing, they could have easily done so, could they not? No, not unless the government gives it to them. No, I understand that. That's the contractual situation, but had the parties agreed to it, had the government and the union agreed to a hearing, could that not have been done? It could have been done. Okay, and it wasn't, was it? The government realized there was some duty here, that's why they set up some process. It was a sham process, and I'm asking you to recognize that, that it was not an adequate and complete process. Before what body should the hearing have been held? An administrative law judge is the normal procedure set up in the codes, and this thing didn't refer to any existing codes. It was just made out of whole cloth. The head person, this Mark Farmer, Dr. Mark Farmer, a wonderful gentleman. I enjoyed deposing him. He was friendly, courteous, but his degree was Dr. Divinity. That's like a law degree, isn't it? Well, most judges think that that's lower than that. Yeah, well, I get your point. Why don't we hear from the United States of America? In due process. All right. Good morning, and may it please the Court. Eric Fleissig-Green with the Department of Justice, appearing on behalf of the appellees. What's the problem with giving this fellow a hearing? Well, with respect, Your Honor, it's not a question of whether it would be a plausible or a feasible situation. It's a question of whether the Constitution requires the U.S. Marshals Service to provide these hearings. And for the reasons the District Court described, and there are two important points, the Constitution does not require it in this case. First... How about fairness? Well, Your Honor, with respect, I don't dispute that it would be a fair system to set up in-person hearings, but the Marshals Service's current system, for the reasons we explained and the Third Circuit has adopted in the Wilson case, is, in fact, a fair process. And it may be helpful to explain precisely how the process... The process, when a man's livelihood depends on exchange of pieces of paper. Well, Your Honor, the... And they don't look at them. Well... They don't ask them, how many push-ups can you do? Let me see you do them right now. Again, I think it's important to explain that the assumption behind your question is these papers weren't looked at, and that's not the case. And in particular... The assumption beyond it, the assumption behind my question is, how can you really make a decision unless you have a live person in front of you? Well, as the Supreme Court explained in Massey's v. Eldridge, when you have medical records and the credibility of doctors is not at issue, and indeed, the doctors here, you need to bear in mind, are physicians selected by the court security officers to provide the evidence that the Marshals Service ultimately looks at. When you have that situation, an in-person hearing does not contribute so greatly to the outcome that the Constitution, as a rule, requires it in all instances. Well, I don't know that I agree with that. Well, with respect, Your Honor, that's... I've looked at medical records and some of these social security cases and... Those pesky ALJs. Yeah, and then we have a hearing, and the guy comes into court, and if you read the papers, it sounds like, well, you got this and this, and he can lift 50 pounds and carry it. And they walk into court, and they look like the wreck of the Hesperus, huh? So... That's an ancient metaphor. I know. I've been waiting to use that for 40 years, and I finally got a chance. Can you quote it? I unfortunately cannot, Your Honor. Are we talking in the original language? Is it Greek or Latin? With respect, the social security determination is a different animal than the one we have here. Social security, I think the agency acknowledges, is no... There are no bright line steps, at least when you get to the sorts of inquiries you're talking about, the step five analysis. You're dealing with people who are supposed to be protecting us. Well, that's right. Shouldn't we give them a little more? Well, what the... Expect them to throw themselves on a hand grenade, you know, that's active. Well, what the marshal service did here was, and I'd like to explain this a little as well, because I think it got lost. It employed Dr. Miller, who is a doctor that specializes in law enforcement occupational medicine. He went out, and he did an elaborate survey of the court security officer position's needs. He talked to judges. He talked to the marshals. He talked to the court security officers themselves. He consulted with audiologists and other doctors, and he came up with very specific guidelines that were necessary. And when you get down to that level of detail... What are those guidelines? The guidelines are actually set forth in... I believe it's set forth in part in our brief at pages, I think, four to five is the explanation behind the guidelines. I mean, they're very... I mean, they're not sort of ephemeral. For hearing, for example, there are very specific thresholds at each of a variety of hearing levels that all you're doing is sending in your hearing tests, and the doctor's looking and seeing, can you meet those hearing thresholds? And plaintiffs are not challenging the substance of those guidelines. Can you say that again? Certainly, Your Honor. It's very specific thresholds for hearing, and plaintiffs are not challenging those hearing thresholds or, in fact, any of the substance of the marshal services guidelines. They make that clear on page 32 of their brief. They make it clear on page 15 of their reply brief. What they're contesting is the procedures that were offered here, and as the district court held, and as the court held in Wilson, the procedures here, which afford an initial opportunity to send in medical information by a contractor-licensed physician, followed by notice of the potential reasons that you may be medically disqualified, and then another opportunity to send in further information from your own physicians is adequate under the due process clause. And with respect specifically to Mr. Hawkins, I'd like to make clear that he did have that opportunity, and he availed himself of it, as did each of the court security officers in this case. And that's on the supplemental excerpts of record that we provided on pages 116 and 117. The marshal service informed him in January of 2002 that he had a potential, potentially disqualifying condition due to his diabetes. Mr. Hawkins provided a response in April of 2002, and then the marshal service, based on that response from his private physicians, concluded on May 30th that Mr. Hawkins did not qualify under the guidelines. And Mr. Hawkins sent in subsequent materials a month after that decision was made, but in third bite at the apple. That was after the final decision of the marshal service had been completed, and he had had his opportunity to submit written information. And again, I'd urge you to look at the supplemental excerpts of record and the district court's decision at pages ER5 to ER6, which explains in detail how Mr. Hawkins was in fact a good example of how these guidelines function in a day-to-day sort of practical basis. I also want to follow up on Judge Smith's question about the actual contours of the contract here, because the contract is very specific, the collective bargaining agreement. And I'd like to clarify that the collective bargaining agreement is between Accal Security, the private security company, and the Court Security Officers Union. It makes very clear that the just cause provision of the contract is accepted in instances where, quote, the company is directed by the marshal service to remove the employee from working under the CSO contract, or the employee's credentials are denied or terminated by the marshal service. Is it fair to say that that provision was placed in the contract expressly, because everybody knew that there was a change coming, that the marshals were going to be reviewed individually to see whether they met the criteria that Dr. Miller came up with the Judicial Council approved? Is that a fair statement? In truth, I don't know exactly what the timeline is for that being added. There's always been a medical guideline, though, under which court security officers are evaluated. And, in fact, I think that recognizes that court security officers may be medically disqualified as a result of those guidelines. They were made more stringent or more sort of fulsome in 2001 when Dr. Miller completed his study. Does the record indicate how many court security officers were terminated prior to 9-11 on a similar provision? Is there anything in there about that? No, there is not, Your Honor. There is... How many have been terminated now? So I'm looking at supplemental excerpts of Record 139. There have been... The dates were as of the time this case was commenced, but from over the four years preceding October 2004, there were 14,402 medical qualification determinations made, and of those, 256 were medical disqualifications. This is a very small percentage of the overall set of medical qualifications. How many terminations were made? 256, Your Honor, out of, again, 14,402 medical qualifications. Does that 14,402, does that include deputy marshals? I believe... I mean, the declaration, I don't know exactly what it says. I'm happy to quote it. How did the 14,000 apply to it? I didn't get... The 14,000 is the number of medical reviews that were done over the course of the four-year period. So I believe it is only court security officers, those employed under the private security contracts of the sort at issue here. So they're the ones who are the 14,402, and of those... Something around 2%, 2%. Math is not my strong suit, that's why I'm an attorney. 14,402. So if we said about, yeah, 1, 1.5%. That's right. Any... What about the deputy marshals? Your Honor, I don't know specifically whether they are also included in that number or not. I would suspect... I don't know that their contracts are with the private security companies or whether they are instead directly with the marshal service. I suspect they're not included in that number. The contracting is different for different positions. But what the contract does make clear is that the just cause provision does not apply, and therefore, there is no legitimate claim of entitlement that plaintiffs can point to that would grant them constitutional protections under the Due Process Clause. If the standard that my good friend, Judge Pregerson, wants to apply, i.e., fairness, as understood at least by me, he was saying that if an employee didn't sit down and look at a contract himself and read it personally and understand it in order for there to be a legitimate and constitutionally enforceable contract, if that were the case, can you conceive of any way in which the federal government could operate with employees? Well, I mean, in fairness, Your Honor, the contracts are not always of this sort. So, I mean, the Wilson case, for example, didn't have this qualification. But the reality is that when people sign contracts, which happens hundreds and hundreds of thousands of times a day, if not millions of times a day in our world, if everybody had to read and understand everything about the contract, wouldn't the whole thing break down? Well, that's correct. I mean, I didn't take Judge Pregerson to be asking about fairness in that respect. I took him to be asking legitimately that the procedures here did actually afford some degree of process. And I hope I've explained in the fashion in which that's the case. I'm just speculating, but I'd say that most of the contracts that ordinary people sign, when they go into a hospital or they buy a car or they get their credit cards and all that, they just sign them. They don't read them. If they read them, they wouldn't understand them because they're in a lot of mysterious language. No, I was just thinking more about if you have someone and the person's job is to protect other people, I just would argue that due process requires some sort of a hearing, face-to-face hearing by the decision maker. You know, I had a case like this back in, may have been in the late 60s or very early 70s, involving a resident at the VA hospital in Westwood. And I talked about the same thing I'm talking about now. Well, the cases in this... Says something about consistency. Well, that's fair. I mean, the cases in this circuit do make clear that when you have a contractually enforceable right, which would give rise to a legitimate claim of entitlement, and where the situation warrants an in-person hearing, I don't dispute that the due process clause might require it in those circumstances, but neither of those circumstances is present here for the reasons the district court explained. I think if you're going to kick somebody out of a government job, and I know you've got a private contractor in there that's part of this whole outsourcing business that we engage in, and that creates a lot of problems, but they are... I mean, when I look at a court security officer, I don't say, well, let's see, this guy, he works for some company out there, and he's not really working for the government, and you're not thinking about that, and they're probably not thinking about that either. So, that's all. I'm just thinking about this. Unless there are any further questions. None that I can think of now. Thank you, Your Honor. All right. May I have 60 seconds? Sure. One thing to straighten out about this so-called collective bargaining agreement. The main contract is between ACAL and the Marshal Service. So, when they come around to working on the collective bargaining agreement, it must comport with that contract, and the union had nothing to do with the contract between the Marshal Service and ACAL, or MVM, on the East Coast. The second thing is, the United States Supreme Court in the Moore C.K. Where does that get you now? Well, I was being asked about, aren't we bound by the collective bargaining agreement, and I'm saying that the collective bargaining agreement had to be structured to fit the contract that the union had nothing to do with. The union had nothing to do with the collective bargaining agreement, or your point is simply that the collective bargaining agreement was not with the government. It was with ACAL. That's right. And ACAL and the contract between ACAL and the government governed what could be bargained for. So, the final point I would make is that the United States Supreme Court in Morrissey said that parolees, in having probation revoked, or prisoners trying to go on probation, get a hearing, either before or after. And I see no reason in economics, or justice, or anything, and due process under our Constitution, why these court security officers can't have as much protection in their jobs as parolees. It goes beyond losing your job. You know, you're applying for another job, and you're asked, well, what happened to your last job? Well, I was terminated. Why were you terminated? Health reasons. They call the employer. Would they hire you back? Well, no, they can't. It has terrible consequences on these people. Thank you. Is your client working now? No. He's one of these people that has had that situation happen to him time after time. Now, Hawkins is working again, doing court security work with a gun, and transporting prisoners, and white water rafting down the rivers. And they said he's unqualified because of his diabetes. He's taking prisoners down the river and rafting? I think I'd like him to take some of these Justice Department folks down the river. Or up the river. That's all right. They can take it. Thank you very much. He's probably a great college swimmer. All right. Thank you. Thank you, sir. All right. Matter will stand submitted.
judges: Pregerson, Noonan, Smith M.